UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

| | |
|---|---|
| CRANSTON REID, Derivatively on Behalf of FIRST HORIZON NATIONAL CORPORATION,<br><br>                Plaintiff,<br><br>vs.<br><br>GERALD L. BAKER, ROBERT B. CARTER, SIMON F. COOPER, MARK A. EMKES, J. KENNETH GLASS, FRANK J. GUSMUS, JR., JAMES A. HASLAM, III, D. BRYAN JORDAN, R. BRAD MARTIN, VICKI R. PALMER, COLIN V. REED, MICHAEL D. ROSE, WILLIAM B. SANSOM and LUKE YANCY III,<br><br>                Defendants,<br><br>     – and –<br><br>FIRST HORIZON NATIONAL CORPORATION, a Tennessee corporation,<br><br>           Nominal Defendant. | Civil Action No.<br><br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

## SUMMARY AND OVERVIEW OF THE ACTION

1.      This shareholder derivative action is brought on behalf of First Horizon National Corporation ("First Horizon" or the "Company") against certain of its former and current officers and directors for breach of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment.

2.      Defendants' misconduct stems from the use of high-risk and unlawful banking practices at First Horizon, defendants' false and misleading financial reporting concerning those lending practices, and defendants' active concealment of their misconduct.

3.      Defendants, as fiduciaries to First Horizon, were each obligated to act loyally and in good faith towards First Horizon. Likewise, defendants were each obligated to fully and fairly disclose the true nature of First Horizon's high-risk unlawful banking practices, the true risks and losses faced by First Horizon, and the failure of controls designed to control risk and loss. Defendants have repeatedly failed to act in a manner consistent with their fiduciary obligations of candor, good faith and loyalty, thereby demonstrating a disregard of their responsibilities to First Horizon.

4.      Recent events have for the first time revealed the extent and severity of defendants' misconduct. On September 30, 2009, the United States District Court for the Western District of Tennessee upheld allegations brought by First Horizon employees against First Horizon, First Horizon's Board of Directors (the "Board") and certain First Horizon officers under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") for breaches of fiduciary duty in connection with the administration of the First Horizon Employee Stock Ownership Plan ("ESOP").[1]

---

[1]      *See Sims v. First Horizon Nat'l Corp.*, No. 08-2293-STA-cgc, 2009 U.S. Dist. LEXIS 90449 (W.D. Tenn. Sept. 30, 2009).

The employees' allegations of breaches of fiduciary duties by First Horizon officers and directors are summarized as follows:

> The Company Stock Fund was an imprudent retirement investment from at least January 1, 2006 because *First Horizon was not fairly and accurately disclosing the risks and likely consequences of a number of its banking practices* such that the Plan was purchasing shares of First Horizon Stock at an inflated price. Among items that were *not disclosed* to participants were the *risks related to the lowering of its underwriting standards; the scope and circumstances of its involvement with subprime, Alt-A, second-lien loans* (*i.e.*, home equity loans), and "One Time Close" home building loans; *its growing dependence on real estate construction loans* fueled by the *increase in subprime mortgages; problems with its accounting for loan losses and loan reserves* which did not reflect its higher risk business plan; and its *increasing use of off-balance sheet transactions and proprietary securitizations* of loans which did not comply with government-sponsored entity ("GSE") conforming mortgage guidelines.

*See* Amended Class Action Complaint, *Sims v. First Horizon Nat'l Corp.*, No. 08-02293 (W.D. Tenn.), filed Sept. 17, 2008 [Dkt. No. 29]. The U.S. District Court's ruling confirms the existence of colorable claims against the First Horizon directors and officers for breaches of fiduciary duty connected to First Horizon's banking and disclosure practices.

5.      The severity and extent of First Horizon's unlawful banking practices previously concealed by defendants continues to surface. On January 12, 2010, First Horizon's banking subsidiary, First Tennessee Bank N.A. ("First Tennessee"), received a subpoena from federal housing officials concerning suspiciously high default rates for loans originated by First Tennessee that were backed by the Federal Housing Administration ("FHA"). The implication of this subpoena is that the FHA suspects First Tennessee may have falsified loan origination data or documents to achieve federal guarantees, as "conforming" loans issued to borrowers who were actually poor credit risks were ineligible for federal guarantees.

6.      As defendants know, the federal authorities' suspicions are well-founded. This was not the first time that First Horizon management allowed loan origination agents to engage in unlawful loan origination activities, including falsification of borrower data and documents. For

example, by the end of 2005, a First Horizon loan officer had pleaded guilty to conspiracy to defraud the Federal Housing and Urban Development Authority ("HUD"), implicating others at First Horizon (including vice presidents). Defendants concealed these material facts from First Horizon's shareholders in financial reports.

7.      By late 2006, First Tennessee entered into a confidential settlement with borrowers who had complained that their loan documents had been falsified by First Tennessee without their knowledge. The settlement came after 15 of the borrowers submitted declarations swearing that First Tennessee had falsified their financial records in connection with the loans. Defendants actively concealed the settlement by failing to disclose it in First Horizon's financial reports and keeping the settlement filed under seal.

8.      Further, in 2007, First Horizon Home Loans faced similar allegations by dozens of borrowers of falsified loan documents and other unlawful loan schemes to fraudulently obtain federal loan guarantees for borrowers who did not otherwise have sufficient creditworthiness to meet the federal guidelines. Defendants concealed the litigation and prosecution of unlawful loan schemes to defraud HUD from First Horizon shareholders.

9.      In 2008, a former First Horizon corporate security investigator filed a whistleblower claim at the Department of Labor alleging that First Horizon Home Loans routinely concealed mortgage and banking fraud. The whistleblower claimed to have uncovered 50 cases of mortgage fraud at First Horizon. When the whistleblower showed cases of wrongdoing to her supervisors at First Horizon, the supervisors "intervened or overrode" her investigations, or took "no action at all."

10.     The unlawful banking practices, absence of loan origination controls, and active concealment are compounded by First Horizon's use of yield-spread premiums. Defendants knew the use of yield-spread premiums would fuel overly aggressive, predatory lending practices. Even

after a history of concealment and confidential settlements concerning unlawful banking practices, defendants knowingly, or with reckless indifference, failed to publicly disclose the issuance of the January 2010 subpoena to First Tennessee in breach of their fiduciary duties of candor, good faith and loyalty.

11.     By actively concealing known facts about First Horizon's high-risk and unlawful banking practices, defendants were able for years to portray the Company as a stable, healthy banking enterprise that was "one of the top 30 bank holding companies in the U.S." Defendants routinely failed to consider the effect of First Horizon's unlawful banking practices on reported loan loss provisions and allowances. Instead of disclosing these and other material facts about First Horizon's unlawful banking practices, defendants falsely stated in the Company's financial reports that accounting estimates were reasonable and loan loss provisions and allowances were proper. By overstating earnings, defendants were able to reap greater financial awards via inflated stock prices. In reality, defendants had subjected First Horizon to unacceptable risks that threatened the Company's existence. By November 2008, First Horizon was forced to accept over $866 million of bailout funds from the U.S. Government to stem loses associated with the high-risk and unlawful banking practices.

12.     The "anything goes" attitude of First Horizon's leadership was further confirmed on March 24, 2010, when the Company announced that First Horizon, FTN Financial Securities Corp. ("FTN Financial"), First Tennessee and defendant Frank Gusmus, Jr. had each received written "Wells" notices from the Staff of the United States Securities and Exchange Commission ("SEC") stating that the Staff intends to recommend the SEC bring enforcement actions for aiding and

abetting violations of the federal securities laws.[2]  The Board knew, or should have known, of the aiding and abetting allegations in late 2008, when a U.S. Bankruptcy Trustee filed an action against FTN Financial.  Instead of fulfilling their fiduciary duties to disclose the matter to shareholders in the Company's 2008 Form 10-K, and fully investigate and punish wrongdoing, defendants again actively concealed the allegations from First Horizon shareholders and failed to conduct any meaningful investigation.  In fact, instead of punishing defendant Gusmus for his unlawful activities, the Board inexplicably rewarded him with a substantial raise, bonus and extended contract. Defendants disclosed the Sentinel matter in February 2010.

13.     The U.S. Bankruptcy Trustee in the Sentinel matter has called the volume of bribery evidence against the First Horizon defendants "overwhelming" – depicting a pattern of "drinking excursions that lasted until the early morning hours, lavish dinners, strip clubs, tickets to sporting events, golf, trips, consorting with prostitutes, and lodging at defendants' condos."[3]  The U.S. Bankruptcy Trustee confirms a recurring theme in this case that defendants' pattern and practice of circumvented controls is at issue, stating that the bribes "violated the provisions of FTN's client entertainment and gift policies" but that "the policy was deliberately not enforced or there was an implicit understanding among FTN personnel that the policy was not going to be enforced." *Id.*

14.     For years, defendants have actively concealed their misconduct by entering into sealed settlements, non-disclosure agreements, and material omissions in First Horizon's financial

---

[2]     The Wells notices concern the Sentinel Management Group, Inc. ("Sentinel") bankruptcy matter, pending in the Northern District of Illinois, *Grede v. Folan, et al.*, No. 1:08-cv-06587 (Judge Zagel). In the Sentinel matter, a U.S. Bankruptcy Trustee claims First Horizon employees engaged in a pattern and practice of bribing a Sentinel money manager and arranging a year-end repurchase transaction to deceive Sentinel investors.

[3]     Trustee's Status Report to the Court on Phase I Discovery, *Grede v. Folan, et al.*, No. 1:08-cv-06587 (N.D. Ill.), filed Mar. 22, 2010 [Dkt. No. 159].

reports of unlawful activities.  Contemporaneous with this active concealment, defendants have consistently represented to shareholders that First Horizon used reasonable accounting estimates and maintained adequate risk and other controls that were functioning properly and were not circumvented.  Defendants failed to disclose known facts that First Horizon was engaged in unlawful banking activities, that accounting estimates did not consider the true nature and extent of unlawful and high-risk lending, and that meaningful controls did not exist and/or they were routinely circumvented, exposing First Horizon to massive loan, foreclosure and related losses.

15.    The Credit Policy and Executive Committee of the First Horizon Board ("Credit Policy and Executive Committee") was charged with primary credit risk authority and was privy to the setting of loan loss reserves reported in First Horizon's financial reports.  Although the Credit Policy and Executive Committee knew of the high-risk and unlawful banking activities, it did not consider the activities at the time loan loss provisions and allowances were established.  As a result, defendants knew or should have known that loan loss provisions and allowances were routinely and materially understated for years by hundreds of millions of dollars, resulting in false and misleading financial reports through 2009.

16.    The cost to First Horizon of defendants' misconduct continues to grow.  So far, defendants have caused First Horizon to pay and/or commit to paying staggering sums to compensate for defendants' misconduct, including:

- Almost $200 million to cover costs of foreclosures;

- Recognizing over $2 billion in loan losses;

- $67 million in cash dividends paid to the U.S. Government;

- Tens of millions of dollars to defend and settle litigation and criminal prosecution concerning high-risk and unlawful lending practices;

- Millions of dollars to defend lawsuits filed against First Horizon caused by defendants' misconduct, including ERISA class action lawsuits filed by First Horizon employees;

- Defense of a January 2010 FHA investigation of First Horizon's subsidiary bank, First Tennessee, concerning subprime lending and First Tennessee's abnormally high incidence of claims against the FHA mortgage insurance program; and

- Defense of First Horizon, First Tennessee, FTN Financial and defendant Gusmus in response to the March 2010 SEC Wells notices.

The harm to First Horizon is ongoing.

17.     The benefit of bringing this action to pursue adequate remedies on behalf of First Horizon outweighs the costs. However, the Board cannot be expected to take action against the defendants in good faith. A pre-suit demand on the Board to remedy the conduct complained of herein would be futile under these circumstances because a majority of the Company's directors: (i) knew of and approved the unlawful banking practices alleged herein; (ii) failed to control for known risks surrounding those banking practices and/or were aware of the circumvention of controls designed to address those risks; (iii) issued falsified financial reports to conceal known risks; and (iv) have been otherwise alleged to have breached the fiduciary duties with respect to misconduct described herein. The Board also cannot be expected to objectively evaluate their potential liability in good faith given the fact that a majority of First Horizon's directors are named defendants and currently defending similar claims in the ERISA action. Accordingly, a pre-suit demand is futile.

## JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between plaintiff and defendants. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391. First Horizon is headquartered in this District, the wrongdoing complained of herein occurred in this District, and the false public statements and SEC filings, including Forms 10-K, were created in this District and were distributed to First Horizon shareholders from First Horizon offices located in this District. A judgment can most effectively be enforced in this District.

## THE PARTIES

20.     Plaintiff Cranston Reid is and has been a shareholder of First Horizon continuously since September 2003. Plaintiff is a citizen of the State of Texas.

21.     Nominal party First Horizon is a Tennessee corporation with its executive offices and principal place of business located in Memphis, Tennessee. First Horizon once called itself "a premier financial services company with a long history of success and traditions dating back to 1864 . . . [and] one of the top 30 bank holding companies in the U.S." Through its principal subsidiary, First Tennessee, and its other banking-related subsidiaries, First Horizon offers a variety of commercial banking services, and also conducts mortgage banking, capital markets and transaction processing. Hereinafter, the term "First Horizon" refers also to First Tennessee and First Horizon Home Loan Corporation. First Horizon is a citizen of the State of Tennessee.

22.     Defendant Gerald L. Baker ("Baker") became President and Chief Executive Officer ("CEO") and a director of First Horizon and First Tennessee on January 29, 2007. In February 2007 and February 2008, Baker issued certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, falsely representing the sufficiency of First Horizon's financial reports, disclosure controls and procedures, and internal controls over financial reporting. From November 2005 to January 29, 2007, Baker was CEO of First Horizon and First Tennessee. Before November 2005, Baker was Executive Vice President of First Horizon and First Tennessee and President – Mortgage Banking and President and CEO of First Horizon Home Loan Corporation. Baker served on the Credit Policy

and Executive Committee from 2006 until April 9, 2007.  Baker retired from First Horizon on December 31, 2008.  Baker signed the First Horizon Forms 10-K dated February 28, 2007 and February 27, 2008.  Baker is a defendant in the ERISA action.  Baker is a citizen of the State of Tennessee.

23.     Defendant Robert B. Carter ("Carter") has been a director of First Horizon since July 2007.  Carter is Executive Vice President – FedEx Information Services and Chief Information Officer for FedEx Corporation, and an expert in information systems and related controls.  Carter has served on the Audit Committee of the First Horizon Board ("Audit Committee") since July 2007.  By virtue of his position on the Board and the Audit Committee, Carter knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law.  Carter has served on the Board of Saks Incorporated with defendant Martin.  First Horizon paid Carter $346,588 in director fees from 2007 to 2009, and Carter has ownership interests in 12,385 shares of First Horizon stock.  Carter signed the First Horizon Forms 10-K dated February 27, 2008, February 26, 2009 and February 26, 2010.  Carter is a defendant in the ERISA action.  Carter is a citizen of the State of Tennessee.

24.     Defendant Simon F. Cooper ("Cooper") has been a director of First Horizon since 2005.  Cooper has served on the Audit Committee since 2006.  The Board has represented that Cooper has experience in finance, accounting and risk management.  By virtue of his experience and position on the Audit Committee, Cooper knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First

Horizon employees were engaged in violations of law. First Horizon paid Cooper $780,877 in director fees from 2005 to 2009, and Cooper has ownership interests in 9,313 shares of First Horizon stock. Cooper signed the First Horizon Forms 10-K dated February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. (Cooper apparently did not sign and date the 2005 Form 10-K dated March 8, 2006, although at the time he was a director of First Horizon.) Cooper is a defendant in the ERISA action. Cooper is a citizen of the State of Virginia.

25.    Defendant Mark A. Emkes ("Emkes") has been a director of First Horizon since November 19, 2008. Emkes has served on the Audit Committee since 2008. The Board has represented that Emkes has experience in finance, accounting and risk management. By virtue of his experience and position on the Audit Committee, Emkes knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. First Horizon paid Emkes $160,996 in director fees from 2008 to 2009, and Emkes has ownership interests in 7,536 shares of First Horizon stock. Emkes signed the First Horizon Forms 10-K dated February 26, 2009 and February 26, 2010. Emkes is a citizen of the State of Tennessee.

26.    Defendant J. Kenneth Glass ("Glass") was the CEO of First Horizon from 2004 until January 29, 2007 and served on the Board from 1996 until April 2007. In March 2006, Glass issued a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, falsely representing the sufficiency of First Horizon's financial reports, disclosure controls and procedures, and internal controls over financial reporting. Glass was the Chair of the Credit Policy and Executive Committee from at least 2005 until January 29, 2007, and served on this committee until April 2007. Glass

signed the false and misleading Forms 10-K dated March 8, 2006 and February 28, 2007. Glass is a defendant in the ERISA action. Glass is a citizen of the State of Tennessee.

27.     Defendant Frank J. Gusmus, Jr. ("Gusmus") is the President of FTN Financial, the capital markets business of First Horizon. Gusmus began his career with First Horizon in 1982 as a CPA. As a CPA, Gusmus is aware of financial reporting matters and related accounting principles. In 2006, Gusmus arranged a repurchase transaction that lacked economic substance and purpose, for purposes of aiding and abetting a client of First Horizon in an alleged securities fraud. Gusmus's misconduct has exposed First Horizon to substantial liability and loss. Gusmus is a citizen of the State of Tennessee.

28.     Defendant James A. Haslam, III ("Haslam") has been a director of First Horizon since 1996. Haslam has served on the Credit Policy and Executive Committee since 2008. The Board has represented that Haslam has extensive experience in finance, accounting, corporate governance and risk assessment. By virtue of his experience and position on the Credit Policy and Executive Committee, Haslam knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. Haslam has served on the boards of directors of Dillard's, Inc. and Ruby Tuesday, Inc. with defendant Martin. First Horizon paid Haslam $705,847 in director fees from 2005 to 2009, and Haslam has ownership interests in 82,353 shares of First Horizon stock. Haslam signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. Haslam is a defendant in the ERISA action. Haslam is a citizen of State of Tennessee.

29.     Defendant D. Bryan Jordan ("Jordan") is President and CEO and a director of First Horizon and First Tennessee Bank National Association, and has held these positions since at least September 1, 2008.  In February 2008, February 2009 and February 2010, Jordan  issued certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, falsely representing the sufficiency of First Horizon's financial reports, disclosure controls and procedures, and internal controls over financial reporting. Before September 1, 2008, Jordan was Chief Financial Officer of First Horizon and First Tennessee Bank.  From 2000 to May 1, 2007, Jordan was Senior Executive Vice President and Chief Financial Officer of Regions Financial Corporation and its subsidiary Regions Bank.  Jordan has served as a member of the Credit Policy and Executive Committee since 2008. Jordan signed the First Horizon Forms 10-K dated February 27, 2008, February 26, 2009 and February 26, 2010.  Jordan is a citizen of the State of Tennessee.

30.     Defendant R. Brad Martin ("Martin") has been a director of First Horizon since 1994. Martin has served on the Credit Policy and Executive Committee since 2005 (and chaired that committee in 2006).  The Board has represented that Martin has "the experiences typically associated with serving as CEO of a public company, including finance and accounting, securities markets and compliance, corporate governance . . . [and] risk assessment."  By virtue of his experience and position on the Credit Policy and Executive Committee, Martin knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law.  Martin has served on the board of directors of Gaylord Entertainment Co. with defendants Reed and Rose, on the board of directors of Saks Incorporated with defendant Carter, and on the boards of directors of Dillard's, Inc. and Ruby Tuesday, Inc. with defendant Haslam.  First Horizon paid Martin $968,606

in director fees from 2005 to 2009, and Martin has direct and indirect ownership interests in 431,966 shares of First Horizon stock.  Martin signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010.  Martin is a defendant in the ERISA action.  Martin is a citizen of the State of Tennessee.

31.     Defendant Vicki R. Palmer ("Palmer") has been a director of First Horizon since 1993.  Palmer has served as Chair of the Audit Committee since at least 2004 and has served on the Credit Policy and Executive Committee since 2009.  The Board designated Palmer as an "audit committee financial expert" as defined in Item 407(d)(6) of SEC Regulation S-K.  Palmer has experience as a member of Coca-Cola Enterprises, Inc.'s Risk Committee charged with establishing policy and internal controls.  By virtue of her financial and controls experience, and positions on the Audit Committee and Credit Policy and Executive Committee, Palmer knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law.  First Horizon paid Palmer $912,554 in director fees from 2005 to 2009, and Palmer has ownership interests in 10,070 shares of First Horizon stock.  Palmer signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010.  Palmer is a defendant in the ERISA action.  Palmer is a citizen of the State of Georgia.

32.     Defendant Colin V. Reed ("Reed") has been a director of First Horizon since 2006. Reed has served on the Audit Committee from 2006 until November 18, 2008.  During that time, the Board designated Reed as an "audit committee financial expert" as defined in Item 407(d)(5) of SEC Regulation S-K.  Reed has extensive experience as a corporate controller, with expertise in policy, accounting and internal controls.  By virtue of his experience and position on the Audit Committee,

Reed knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. Reed served on the board of directors of Gaylord Entertainment Co. with defendants Martin and Rose. First Horizon paid Reed $582,234 in director fees from 2006 to 2009, and Reed has ownership interests in 62,601 shares of First Horizon stock. Reed signed the First Horizon Forms 10-K dated February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. Reed is a defendant in the ERISA action. Reed is a citizen of the State of Tennessee.

33.    Defendant Michael D. Rose ("Rose") is Chairman of the Board of First Horizon and First Tennessee Bank and has been in these positions since January 2007. Rose has been a director of First Horizon since 1984. Rose has served as Chairman of the Credit Policy and Executive Committee since 2007 and has also served on that committee continuously beginning in 2004. The Board has determined that Rose is not independent under New York Stock Exchange Listing Standards. By virtue of his experience and position on the Credit Policy and Executive Committee, Rose knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. Rose served on the board of directors of Gaylord Entertainment Co. with defendants Reed and Martin. First Horizon paid Rose $796,378 in director fees from 2005 to 2009, and Rose has direct and indirect ownership interests in 138,315 shares of First Horizon stock. Rose signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. Rose is a defendant in the ERISA action. Rose is a citizen of the State of Tennessee.

34.     Defendant William B. Sansom ("Sansom") has been a director of First Horizon since 1984. Sansom has served on the Credit Policy and Executive Committee since at least 2004. The Board has determined that Sansom was not independent under New York Stock Exchange Listing Standards from 2005 to March 2010. The Board has represented that Sansom has extensive experience in finance, accounting, corporate governance and risk assessment. By virtue of his experience and position on the Credit Policy and Executive Committee, Sansom knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. First Horizon paid Sansom $951,977 in director fees from 2005 to 2009, and Sansom has ownership interests in 27,970 shares of First Horizon stock. Sansom signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. Sansom is a defendant in the ERISA action. Sansom is a citizen of the State of Tennessee.

35.     Defendant Luke Yancy III ("Yancy") has been a director of First Horizon since 2001. Yancy has served on the Audit Committee since at least 2004. By virtue of his experience and position on the Audit Committee, Yancy knew, or should have known, that First Horizon managers were engaged in unlawful and/or improper banking practices that exposed First Horizon to substantial risk of loss, that loan origination controls were routinely circumvented, and that First Horizon employees were engaged in violations of law. First Horizon paid Yancy $740,486 in director fees from 2005 to 2009, and Yancy has ownership interests in 10,935 shares of First Horizon stock. Yancy signed the First Horizon Forms 10-K dated March 8, 2006, February 28, 2007, February 27, 2008, February 26, 2009 and February 26, 2010. Yancy is a defendant in the ERISA action. Yancy is a citizen of the State of Tennessee.

**First Horizon Board Committees Engaged in Misconduct**

| Year | Credit Policy and Executive Committee | Audit Committee |
|---|---|---|
| 2005 | Glass (Chair)<br>Martin<br>Rose<br>Sansom | Palmer (Chair)<br>Yancy |
| 2006 | Baker<br>Glass (Chair 1/29/07)<br>Martin (Chair)<br>Rose<br>Sansom | Cooper<br>Palmer (Chair)<br>Reed<br>Yancy |
| 2007 | Baker<br>Glass<br>Martin<br>Rose (Chair)<br>Sansom | Carter<br>Cooper<br>Palmer (Chair)<br>Reed<br>Yancy |
| 2008 | Haslam<br>Jordan<br>Martin<br>Rose (Chair)<br>Sansom | Carter<br>Cooper<br>Emkes<br>Palmer (Chair)<br>Yancy |
| 2009 | Haslam<br>Jordan<br>Martin<br>Rose (Chair)<br>Palmer<br>Rose<br>Sansom | Cooper<br>Carter<br>Emkes<br>Palmer (Chair)<br>Yancy |

**Duties of First Horizon's Officers and Directors**

36. By reason of their positions as First Horizon's directors and officers, and because of their ability to control the Company's business and affairs, defendants owed and owe First Horizon and its shareholders fiduciary duties of candor, good faith and loyalty, and were and are required to use their utmost ability to control and manage First Horizon in a fair, just, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of First Horizon

- 16 -

and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37.     Each director and officer of the Company owes to First Horizon the fiduciary duty to exercise candor, good faith and loyalty in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as directors and/or officers of a public company, defendants had a fiduciary duty to promptly disseminate accurate and truthful information to shareholders with regard to the Company's financial performance and financial results.

38.     Defendants, because of their positions of control and authority as directors and/or officers of First Horizon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their senior positions with First Horizon, defendants, and each of them, had access to adverse nonpublic information about the unlawful lending schemes, abusive loan practices and other abusive actions described herein.

39.     By reason of their positions as First Horizon's directors, officers and/or fiduciaries, defendants were required to, among other things:

(a)     Ensure that risk controls were functioning properly and were not being overridden by employees;

(b)     Ensure that the Company reports truthful financial information, including First Horizon's true exposure to lending risks, financial reporting risks, and the risk of litigation and regulatory review;

(c)     Ensure that the Company and its employees act within the scope of the law when conducting lending activities and transactions;

- 17 -

(d)      Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting First Horizon's assets, preserve liquidity, and to maximize the value of the Company's stock; and

(e)      Remain informed as to how the Company conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices such as unlawful or potentially unlawful activities implicating First Horizon, to make reasonable inquiry in connection therewith, and to take steps correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state laws.

**The Credit Policy and Executive Committee of the Board**

40.      At all relevant times, the Credit Policy and Executive Committee was responsible for monitoring the quality, liquidity, and concentrations of credit extended by First Horizon and its affiliates, and was responsible for approving credit policies and controls. As represented in First Horizon's proxy statements, the Credit Policy and Executive Committee has primary authority for credit risk activities at First Horizon.

41.      The charter of the Credit Policy and Executive Committee was amended to give the Credit Policy and Executive Committee complete control over both the compensation and composition of personnel responsible for reviewing loan files and identifying the loan exceptions that would determine the amount of loan reserves and related impact to First Horizon's earnings. As a result, directors on the Credit Policy and Executive Committee were privy to the credit risks faced by First Horizon and the truth surrounding those risks.

**The Audit Committee of the Board**

42.      At all relevant times, the Audit Committee was charged with oversight of the financial information provided to First Horizon's shareholders, appointment and compensation of First Horizon's independent auditors, oversight of the material examinations of First Horizon and its

affiliates conducted by federal and state regulatory and supervisory authorities, service as the audit committee of First Horizon's banking subsidiary, oversight review of allowance for loan and lease losses methodology (including review of trends relating to non-performing assets and charge-offs, and the appropriate level and adequacy of the allowance for loan and lease losses), oversight review relating to financial reporting, compliance, legal, and information security and fraud risk matters, and supervision and direction of any special projects or investigations deemed necessary. The First Horizon Audit Committee was also charged with responsibility for reviewing the adequacy of the Company's internal controls, including a review of the disclosures required by Section 302 of the Sarbanes-Oxley Act of 2002 and rules promulgated thereunder by the SEC. Additionally, the Audit Committee and its members had full access to all First Horizon employees and the Company's corporate books and records, and were responsible for preparing the Audit Committee section of First Horizon annual proxy statements.

**Aiding and Abetting and Concerted Action**

43.     In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

44.     At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did conceal the true risks First Horizon faced due to defendants' lending schemes, false financial reporting and breach of fiduciary duties.

45.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing,

substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**First Horizon's Increasingly High-Risk Banking Practices**

46.     In the mid-2000s, defendants caused First Horizon to abandon its traditional banking model and embark on a "national expansion strategy" whereby First Horizon originated and securitized ever-increasing numbers of subprime and Alt-A mortgage loans, second lien mortgage loans, home equity loans and lines of credit ("HELOCs"), retail real estate construction loans to individual consumers to build homes ("one time close loans") and commercial construction loans to single-family home builders ("homebuilder loans"). First Horizon's expansion strategy was aggressive, highly risky, and dependant upon real estate appreciation, illusory underwriting standards and/or non-traditional financing arrangements. Indeed, while First Horizon's gross income grew to over $2.2 billion between 2004 and 2007 as a result of this strategy (and its net income increased to over $462.9 million during the same period of time), these purported "results" were achieved only by concealing the Company's significant exposure to risky loans and credit risks, and through the abandonment of meaningful internal controls.

47.     By 2004, the Credit Policy and Executive Committee had approved a credit policy whereby First Horizon loan originators could use "Super Expanded Underwriting Guidelines" to dramatically increase First Horizon's loan business. These relaxed underwriting standards allowed for reduced borrower FICO scores, poor credit histories, reduced loan-to-value ratios and reduced debt-to-income ratios that were significantly less restrictive than standard loan programs. Loans underwritten using the "Super Expanded Underwriting Guidelines" were non-conforming and therefore not eligible for sale to conventional secondary markets such as Fannie Mae or Freddie Mac.

48.     Between 2004 and 2007, First Horizon increased its exposure to three higher-risk lending products in particular: HELOCs, homebuilder loans, and one time close loans. The HELOCs were risky because they were second in priority to any security interest: if the value of the security interest declined, the HELOC would be the first loan at risk. Homebuilder loans were risky because a housing bubble was evident in the Case-Shiller Index. One time close loans were likewise risky because those loans were for construction of homes and the borrowers typically had existing mortgages. Defendants knew, or should have known, that these lending products were problematic, necessitating robust controls and meaningful risk assessments.

49.     Defendants acknowledged the inherently risky nature of First Horizon's new lending practices in Company financial filings and other public statements. For example, CEO defendant Jordan acknowledged in a January 2008 earnings conference call that, in the case of one time close loans (a loan is given to a borrower to build a home) where the borrower typically has an existing loan, that "clearly a [stepped] product is more susceptible to misrepresentation and fraud." Despite these risks, Jordan and his co-defendants failed to cause management to control for known risk. To make matters worse, many of these loans did not conform to government-sponsored entity ("GSE") guidelines for federally insured mortgages.

50.     The "Super Expanded Underwriting Guidelines" approved by the Credit Policy and Executive Committee dramatically increased loan originations. Contemporaneous with these loan originations, defendants identified certain credit-related risks to First Horizon. However, defendants failed to adequately control for those known risks and identify further risks to the Company. Although defendants were in the business of asset allocation and risk assessment, defendants were grossly mismanaging asset allocation, creating (not controlling) risk by concentrating on sub-prime borrowers.



51.    Defendants knew that these loan products posed substantial risk to First Horizon. Thus, First Horizon became increasingly reliant upon secondary markets to securitize and sell its loans that did not conform to GSE guidelines.  To sell and securitize these risky loans, First Horizon was often forced to retain credit risks associated with the loans.

**First Horizon's Unlawful Lending Practices Further Increase Credit Risks**

52.    A subsidiary of First Horizon, called First Horizon Home Loans, originated conventional conforming and federally insured single-family residential mortgage loans.  First Horizon exchanged substantially all of these mortgage loans for securities, which were issued through investors, including GSEs, such as Government National Mortgage Association ("GNMA") for federally insured loans, and Federal National Mortgage Association ("FNMA") and Federal Home Loan Mortgage Corporation ("FHLMC") for conventional loans, and then sold in the secondary markets.

53.    Each GSE has specific guidelines and criteria for sellers and servicers of loans backing their respective securities.  Many private investors are also active in the secondary market as

issuers and investors. The risk of credit loss with regard to the principal amount of the loans sold is generally transferred to investors upon sale to the secondary market. To the extent that transferred loans are subsequently determined not to meet the agreed-upon qualifications or criteria, the purchaser has the right to return those loans to First Horizon. In addition, certain mortgage loans are sold to investors with limited or full recourse in the event of mortgage foreclosure.

54.     As detailed below, defendants engaged in a scheme whereby they caused or permitted, in breach of their fiduciary duties to First Horizon, GSE lending practices whereby defendants' agents had the ability to falsify borrower information. Defendants also caused or permitted the falsification of borrower information for purposes of falsely qualifying loans to meet HUD or FHA creditworthiness requirements. FHA audits of First Tennessee revealed poor lending controls that contributed to a significant number of exceptions which jeopardized the federal guarantees on approximately $48 million worth of loans.

55.     HUD and FHA regulations require home buyers to meet certain equity requirements at the time of loan closing. In an FHA-insured loan transaction, for example, borrowers are required to make an "earnest money" down payment (from their own funds) of at least 3% of the purchase price, or otherwise receive down payment proceeds from *bona fide* gifts or the purchaser's sweat equity contribution. Also, FHA permits a seller to pay certain closing costs on behalf of buyers limited to 6% of the purchase price.

56.     Defendants knew, or should have known, that their agents were employing various lending schemes to circumvent FHA/HUD regulations, including paying off debts of borrowers, advancing funds to relatives of borrowers who would then "gift" those funds to the borrowers, using inflated appraisals, and creating false gift letters. For example, the First Horizon loan officer who

had pled guilty to conspiracy to defraud the federal government explained that others at First Horizon were aware of the unlawful loan originations.

57.     To conceal the scheme, First Horizon's agents were using money orders, cashier's checks, certified checks, or third party checks to conceal the true source of the funds.  The GSE lending schemes defrauded HUD and FHA, who insured the mortgages, by creating the illusion that these borrowers qualified for these federally insured GSE loans, when in fact these borrowers were not qualified.  As a result, First Horizon has been named as a defendant in a number of costly and expensive lawsuits, which has severely damaged its business, goodwill and reputation.  *See, e.g., Carr, et al. v. First Horizon Home Loan, et al.*, No. 1:06-cv-01114 (M.D. Pa.); *Holt, et al. v. First Horizon Home Loan, et al.*, No. 1:06-cv-00018 (M.D. Pa.); *Keener v. MetLife Home Loans, et al.*, No. 3:10-cv-00513 (N.D. Tex.).

58.     Defendants Glass, Rose and Sansom (as members of the Credit Policy and Executive Committee), and defendants Palmer and Yancy (as members of the Audit Committee) knew, or should have known, that loan originations that were either unlawful or did not reflect the economic reality of the borrowers were a pervasive problem at First Horizon for which existing controls were not existent or inadequate.  Instead of fixing these controls and improving the underwriting and fraud detection process for FHA loans, defendants continued to expose First Horizon to harm by allowing Company representatives to prepare loan documentation that was either false or fraudulent and did not reflect the economic reality of the borrower.

59.     First Horizon's high-risk and unlawful banking activities created the false appearance that many First Horizon borrowers were not only well qualified but subject to a federal guarantee that protected First Horizon from credit risk.  In fact, First Horizon was not so protected.  Many of First Horizon's borrowers were actually not qualified for conforming loans and did not have the

means to repay their loans, causing First Horizon to suffer a very high default rate. The high default rate resulted in First Horizon recognizing over $1 billion of loan losses and prompting a subpoena issued by the Office of the Inspector General of HUD in January 2010.

**Defendants Knew that First Horizon Faced Substantial**
**Credit Risks that Could Gravely Impair the Company**

60.    Defendants prepared, issued and/or signed filings with the SEC that explained the importance to the Company's business of a borrower's ability to repay a loan, and the risk of loss due to borrower's inability to repay the loan obligation. Defendants also knew that First Horizon retained credit risks on the non-conforming loans it originated, whereby such risks were not reflected in the Consolidated Statements of Condition, but were instead conducted in off-balance sheet arrangements.

61.    The Credit Policy and Executive Committee of the Board had primary authority for credit risk activities at First Horizon. As part of this authority, the Credit Policy and Executive Committee authorized the implementation and use of First Horizon's "Super Expanded Underwriting Guidelines," which were integral to First Horizon's national expansion strategy.

62.    Defendants knew that the "Super Expanded Underwriting Guidelines" required less documentation and allowed for reduced borrower FICO scores, reduced loan-to-value ratios, and reduced debt-to-income ratios that were far less restrictive than standard documentation loan programs. Accordingly, defendants knew that the Company was originating mortgage loans that carried far greater credit risk to First Horizon.

63.    Defendants knew that mortgage loans underwritten in accordance with First Horizon's "Super Expanded Underwriting Guidelines" were non-conforming and therefore not available for federal guarantee and thus much harder to sell and securitize. Because the mortgage loans were underwritten under guidelines that are less restrictive than the standard underwriting

guidelines, defendants knew that the mortgage loans underwritten using the "Super Expanded Underwriting Guidelines" were likely to experience higher rates of delinquency, foreclosure and loss than those experienced by mortgage loans underwritten in accordance with standard underwriting guidelines. Further, defendants knew that the risks associated with the securitization of these non-conforming loans was carried "off-balance sheet," which, in turn, gave the deceptive appearance of a moderate and/or stable risk profile on First Horizon's balance sheet.

64.     Defendants were also on notice of guidelines that would assist proper risk assessment and reporting. For example, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS"), and the National Credit Union Administration issued the "Credit Risk Management Guidance for Home Equity Lending" ("Credit Risk Guidance"). The Credit Risk Guidance stated that the agencies had "found that, in many cases, institutions' credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards." The Credit Risk Guidance further stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios." The Credit Risk Guidance also provided that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."

65.     The Credit Risk Guidance also found that properly underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt. Given the home equity products' long-term nature and the large credit amount typically extended to a consumer, evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score. The Credit Risk Guidance stated that "underwriting standards for

interest-only and variable rate HELOCs should include an assessment of the borrower's ability to amortize the fully drawn line over the loan term and to absorb potential increases in interest rates."

66.     Similarly, the OCC, the Federal Reserve, the FDIC, the OTS, and the National Credit Union Administration jointly issued the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("OCC Guidance").   The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms and underwriting standards were consistent with prudent lending practices, which require a credible analysis of a borrower's repayment capacity.  The OCC Guidance provided that such loans should be underwritten based on a borrower's ability to make fully amortizing payments at the fully indexed interest rate.  For products like payment option adjustable-rate mortgages ("ARMs") that permit negative amortization, the OCC Guidance provided that a lender should base its underwriting analysis on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan.  Even after the OCC Guidance was issued, First Horizon continued to initiate interest-only mortgages, ARMs, HELOCs, and second-lien mortgages which were far more risky and did not take into account the OCC Guidance.

**Defendants Breached Their Fiduciary Duties by Falsely**
**Reporting First Horizon's True Exposure to Loan Losses**

67.     Defendants concealed First Horizon's true exposures to loan losses and abusive lending practices causing First Horizon to issue false financial results for the years ending 2005 through 2009 by, among other things, misstating loan loss allowances, intangible assets and non-interest expenses.  These misstatements of financial reports were made in violation of Generally Accepted Accounting Principles ("GAAP").  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that

financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

68.    Each reporting period, defendants were required to assess whether First Horizon's loan losses exposed the Company to loss contingencies. Proper GAAP reporting for loss contingencies, such as First Horizon's exposure to loan losses, is governed by Statement of Financial Accounting Standards No. 5 ("FAS 5"). FAS 5 provides, in part:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> (a)    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> (b)    The amount of the loss can be reasonably estimated.

69.    In sum, disclosure of loss contingencies under FAS 5 first depends upon the assessed likelihood of loss. There are three levels of loss estimation prescribed by FAS 5, ¶3: probable, reasonably possible, and remote. "Remote" is defined as "[t]he chance of the future event or events occurring is slight" and "probable" is defined as "[t]he future event or events are likely to occur." "Reasonably possible" is in the middle, defined by FAS 5 as "[t]he chance of the future event or events occurring is more than remote but less than likely." At all relevant times, defendants caused First Horizon to report in Forms 10-K that its likelihood of massive losses under the Company's loan portfolios was remote. Further, defendants caused First Horizon to falsely report in Forms 10-K that any loss would be minimal and possibly immaterial. In fact, however, First Horizon had and would

continue to suffer significant loan losses due to defendants' high-risk and unlawful banking practices that were not adequately controlled and reported.

70.    In fact, throughout 2003 through 2005, as defendants knew or should have known, there was a housing bubble of historical proportions in the United States, as reflected in the Case-Shiller Index:



71.    From 2005 until recently, defendants continued to misrepresent and actively conceal the nature of First Horizon's underwriting practices and First Horizon's exposure to extreme risks caused by those underwriting practices.   Defendants also failed to control for known risks surrounding its ever-growing portfolio of risky loans.   Had defendants properly controlled credit risks, First Horizon could have avoided substantial loan losses and foreclosure costs.   Instead defendants concealed the true risks of loss by understating loan loss provisions for years.   As the following chart shows, First Horizon's provisions for loan losses from 2005 through at least 2008

did not reflect true expected losses because they did not consider the unlawful and high-risk nature of First Horizon's lending practices.



**Defendants Breached Their Fiduciary Duties to
First Horizon by Issuing False and Misleading
Financial Reports on Behalf of First Horizon**

72.    As particularized in ¶¶22-35, defendants issued financial reports, on behalf of First Horizon, on Forms 10-K filed with the SEC for the fiscal years ending 2005 through 2009. Defendants knew or should have known that these financial reports were materially false and misleading when executed and issued by defendants because, *inter alia*:

(a)    The financial reports failed to disclose and actively concealed First Horizon's unlawful and high-risk banking practices, and the consequences of that misconduct, including civil and criminal matters alleging falsification of loan documents by First Horizon, falsification of loan data provided to regulatory authorities, falsification of borrower financial information for purposes

of originating loans, and use of yield-spread premiums and other broker incentives designed to originate high-risk loans;

(b)     The directors on the Audit Committee and the Credit Policy and Executive Committee responsible for credit policies, evaluation of loan loss methodologies, and evaluation of credit risk and controls, knew or should have known that the loan loss provisions and allowances represented in the financial reports were materially misstated because the extent and impact of First Horizon's unlawful and high-risk banking activities had not been considered in the preparation of the Company's financial reports filed with the SEC;

(c)     The nature, extent and on-going recurrence of First Horizon's unlawful and high-risk banking activities, and the consequences of that misconduct in the form of civil and criminal matters, alerted defendants that First Horizon did not have or maintain adequate controls over loan origination activities, loan loss and foreclosure risks, and that existing controls were routinely circumvented, rendering controls ineffective;

(d)     Although defendants were aware of First Horizon's unlawful and high-risk banking practices, they failed to conduct a meaningful independent investigation of those practices for purposes of determining whether the financial reports, including reports of loan loss provisions and allowances, had reasonable bases in fact; and

(e)     Defendants knew or should have known that there was a high probability that loan loss provisions and allowances were materially understated based upon their understanding of a housing bubble in geographic regions where First Horizon originated loans, that the unlawful and high-risk practices increased the likelihood of material misstatement, and that defendants had not undertaken any meaningful investigation or analyses in response to these known concerns.

73.     Defendants violated their fiduciary duties of candor, good faith and loyalty by disseminating financial reports on behalf of First Horizon to the SEC, to the investing public, and to First Horizon's shareholders, that they knew or should have known were materially misstated. Likewise, defendants, in bad faith, abdicated their supervision of management's compliance with financial reporting standards and controls – standards and controls that defendants knew or should have known were routinely absent, violated or circumvented. Thus, defendants issued First Horizon's financial reports in bad faith.

**Defendants Breached Their Fiduciary Duties by**
**Allowing First Horizon Subsidiaries and Defendant**
**Frank Gusmus to Aid and Abet Violations of Securities Laws**

74.     On February 26, 2010, First Horizon disclosed in its 2009 Form 10-K:

> On February 16, 2010, an employee of FHN's subsidiary FTN Financial Securities Corp. ("FTNFS"), along with a former employee of FTNFS, each received a "Wells" notice from the Staff of the United States Securities and Exchange Commission (the "SEC") stating that the Staff intends to recommend that the SEC bring enforcement actions for allegedly aiding and abetting a former FTNFS customer, Sentinel Management Group, Inc. ("Sentinel"), in violations of the federal securities laws. The subject of the Wells notices is a 2006 year-end securities repurchase transaction entered into by FTNFS with Sentinel. The Staff has indicated that FTNFS and one additional employee of FTNFS may also receive Wells notices.

75.     Defendants, who issued the First Horizon 2009 Form 10-K knew or should have known that this statement was incomplete when made because the employee and former employee receiving the Wells notices were able to complete the 2006 repurchase transaction because of the substantial assistance they received from defendant Gusmus and other FTN Financial personnel who conducted both an illegal $20 million loan through First Tennessee and the illegal repurchase transaction.

76.     Given this disclosure, defendants knew and should have known of defendant Gusmus's involvement in aiding and abetting violations of the securities laws when the 2009 Form 10-K was filed on February 26, 2010. Yet, despite the Board's actual or constructive knowledge of

his misconduct, defendant Gusmus was awarded 52,185 shares of First Horizon restricted stock,

when the closing price of tradeable shares was $12.80.

77.    The SEC investigation is gaining momentum, as First Horizon indicated on March 24,

2010 when the Company disclosed in a Form 8-K:

> On March 18, 2010, two subsidiaries of First Horizon National Corporation ("FHN"), FTN Financial Securities Corp. ("FTNFS") and First Tennessee Bank National Association, along with an executive officer, Frank J. Gusmus, Jr., received written "Wells" notices from the Staff of the United States Securities and Exchange Commission (the "SEC") stating that the Staff intends to recommend that the SEC bring enforcement actions for allegedly aiding and abetting a former FTNFS customer, Sentinel Management Group, Inc. ("Sentinel"), in violations of the federal securities laws. The subject of the Wells notices is a 2006 year-end securities repurchase transaction entered into by FTNFS with Sentinel, as discussed in Note 18 of FHN's Annual Report to shareholders for the year 2009.

78.    No later than 2005, defendants knew that Keefe, Bruyette & Woods, Inc. ("KBW")

and FTN Financial had developed an exotic collateralized debt obligation ("CDO") called the

"Preferred Term Securities Limited" ("PreTSL") program. With PreTSLs, First Horizon agents

aggressively approached a variety of regional banks and savings and loans to help those institutions

raise capital, primarily by issuing trust preferred securities. Trust preferred securities were attractive

to banks seeking to raise capital because, while they pay interest like debt securities, they are treated

as capital for regulatory purposes. KBW and FTN Financial created various PreTSL trust vehicles

which issued multiple classes of notes to investors. The note proceeds were used to purchase trust

CDOs.

79.    The typical PreTSL capital structure consisted of a multiple series of notes, whereby

each series had a specified interest rate and a different priority position for distributions of income

and principal ("tranches"). For example, the senior note tranche generally had first priority of

payment and the lowest stated interest rate. The stated interest rates for each tranche increased as the

payment priority level decreased. The lowest payment priority level is the "income note" which has

no stated interest rate but receives all funds available for distribution after payment of the higher priority notes. In total, KBW and FTN Financial created 28 PreTSL trust structures, which issued CDOs secured by between 50 to 100 different underlying obligors, with a face amount typically ranging from $600 million to $1.6 billion per offering.

80.      PreTSLs competed fiercely with issuers of other exotic securities for buy and sell transactions. Defendants knew or should have known that competition was so fierce that sales agents might engage in misconduct, such as engaging in unlawful activities and/or selling these securities as an unsuitable investment to conservative funds, in order to consummate huge transactions and fees.

81.      In fact, FTN Financial aggressively marketed the PreTSL products using corrupt and deceptive methods to any customer, regardless of suitability. For example, as alleged by the U.S. Bankruptcy Trustee in the Sentinel matter, FTN Financial transacted almost $400 million of unsuitable PreTSLs with Sentinel using the following means:

- FTN Financial bribed a PreTSL customer with "lavish meals, wine, entertainment, lodging, travel, tickets to sporting events, and other benefits and things of value." Complaint, ¶4, *Grede v. Folan, et al.*, No. 1:08-cv-06587 (N.D. Ill.), filed Nov. 17, 2008.

- FTN Financial provided a customer "with false and misleading information about the liquidity of the securities, particularly FTN's ability and willingness to make a market in these securities, the ratings of the securities, and whether the securities were exposed to risk arising from non-prime lending." *Id.*

- "Because FTN had limited capital and resources, defendants knew that FTN had no way to repurchase all the instruments it sold Sentinel and defendants had no basis for believing it could re-market all those PreTSLs to third parties, particularly within a time frame that could match Sentinel's liquidity promise to its customers." *Id.*, ¶47.

82.      After November 2008, when the U.S. Bankruptcy Trustee alleged that FTN had assisted in aiding and abetting violations of the securities laws by using bribes to facilitate transactions that lacked economic substance and were designed to actively conceal unlawful

activities, defendants concealed the action by the U.S. Bankruptcy Trustee by failing to disclose the matter in First Horizon's 2008 Form 10-K and 2009 Forms 10-Q.

83.     The Trustee's allegations have been upheld by Judge Zagel in the United States District Court for the Northern District of Illinois, following a motion to dismiss filed by FTN Financial and the other defendants.

## TOLLING OF THE STATUTE OF LIMITATIONS AND FIDUCIARY DUTIES

84.     Defendants issued false and misleading financial reports from at least 2005 that misrepresented and concealed defendants' misconduct in connection with First Horizon's unlawful lending and risk management practices. Defendants routinely failed to disclose material criminal and civil litigation concerning its unlawful and other high-risk lending practices, and claims by a whistleblower that First Horizon routinely concealed instances of mortgage fraud from outsiders.

85.     At all relevant times, the full extent of the wrongful actions complained of herein were unlawfully concealed from First Horizon shareholders until late 2009 and early 2010, when it became known that a colorable breach of fiduciary duty claim had been brought by employees against the Board. First Horizon has received a subpoena concerning possible falsification of loan documents, and First Horizon has received a Wells notice concerning aiding and abetting a securities law violation. Further it was not until 2009 and 2010, that defendants disclosed the true extent of losses suffered as a result of risk and unlawful lending practices, including the 2010 disclosure that First Horizon had incurred almost $200 million of costs associated with foreclosures and mortgage buybacks for which defendants had caused First Horizon to retain significant (but undisclosed) risks.

86.     Defendants' misconduct has severely damaged and injured First Horizon's once valuable corporate franchise. By this action, plaintiff seeks to vindicate the Company's claims against its wayward fiduciaries.

## DERIVATIVE ALLEGATIONS

87.    Plaintiff incorporates ¶¶1-86.

88.    Plaintiff brings this action derivatively on behalf of First Horizon to redress injuries suffered by the Company as a direct and proximate result of the breaches of fiduciary duty and other violations of law caused by defendants named herein. First Horizon is named as a nominal defendant solely in a derivative capacity.

89.    Plaintiff is a shareholder of First Horizon common stock and has owned First Horizon common stock continuously since September 2003. Plaintiff will adequately and fairly represent the interests of the Company in this litigation.

90.    On the date this action was initiated, the Board consisted of 11 directors: defendants Carter, Cooper, Emkes, Haslam, Jordan, Martin, Palmer, Reed, Rose, Sansom and Yancy.

91.    The principal professional occupation of defendant Jordan is his employment with First Horizon as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Thus, defendant Jordan lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. Accordingly, demand is futile as to defendant Jordan.

92.    The Board has determined that defendants Sansom and Rose were not independent under New York Stock Exchange Listing Standards. Thus, defendants Sansom and Rose lack independence, rendering them incapable of impartially considering a demand to commence and vigorously prosecute this action. Accordingly, demand is futile as to defendants Sansom and Rose.

93.    Defendants Carter, Cooper, Haslam, Martin, Palmer, Reed, Rose, Sansom and Yancy are each named defendants in the ERISA action, which is based on substantially similar factual allegations as those raised in this shareholder derivative action, which renders them directly interested in a demand. As alleged herein, the operative complaint in the ERISA action has survived

a motion to dismiss and a court has determined that colorable claims exist against the foregoing defendants. In light of the ERISA action, and their potential direct culpability and/or exposure in that action, it is impossible for defendants Carter, Cooper, Haslam, Martin, Palmer, Reed, Rose, Sansom and Yancy, who comprise a majority of the Board, to consider a demand impartially. Accordingly, a pre-suit demand upon defendants Carter, Cooper, Haslam, Martin, Palmer, Reed, Rose, Sansom and Yancy is excused as futile.

94.     Defendants Cooper (who joined the Board in 2005), Haslam (1996), Martin (1994), Palmer (1993), Reed (2006), Rose (1984), Sansom (1984) and Yancy (2001) all engaged in conduct which is not protected by the business judgment rule, excusing demand. As particularized herein, these defendants knew or should have known that a Company loan officer had pleaded guilty to defrauding HUD (and had implicated other Company officers in this scheme), that the Company had entered into a confidential settlement (in 2006) with borrowers who claimed they were defrauded and faced new rounds of charges from borrowers in 2007 which centered on similar allegations. Their decision to not take any action to investigate or remedy First Horizon's lending practices (which have damaged the Company and continue to expose it) is not a protected business judgment. Accordingly, demand upon defendants Cooper, Haslam, Martin, Palmer, Reed, Rose, Sansom and Yancy is excused. Because defendants Cooper, Haslam, Martin, Palmer, Reed, Rose, Sansom and Yancy comprise a majority of the Board, demand is excused.

95.     Defendants Carter, Cooper, Emkes, Haslam, Jordan, Martin, Palmer, Reed, Rose, Sansom and Yancy are all interested in a demand because they face a substantial likelihood of liability in connection with defendants' series of false and misleading statements and/or material omissions. As particularized herein, each of these defendants caused the Company to issue false and misleading statements regarding First Horizon's lending practices and the sufficiency and adequacy

of the Company's internal controls. Defendants Carter, Cooper, Emkes, Haslam, Jordan, Martin, Palmer, Reed, Rose, Sansom and Yancy also caused First Horizon to omit material information from its financial filings. Accordingly, defendants Carter, Cooper, Emkes, Haslam, Jordan, Martin, Palmer, Reed, Rose, Sansom and Yancy face a substantial likelihood of liability for breaching their fiduciary duties of candor, good faith and loyalty. Accordingly, a pre-suit demand upon them is excused.

96.     Defendants Palmer, Carter, Cooper, Reed, Emkes and Yancy, acting in their capacity as members of the Audit Committee, collectively and individually breached his/her fiduciary obligations, and therefore are disabled from considering a demand, because:

(a)     As a result of receiving loan file review results and information about pending litigation related First Horizon's lending practices, the Audit Committee knew of the magnitude and extent of the financial exposure faced by First Horizon, including the likelihood that First Horizon would incur hundreds of millions of dollars of losses associated with highly risky and unlawful lending activities;

(b)     As a result of knowing of the likelihood of loss and the amount of exposure First Horizon faced with respect to abusive lending practices, the Audit Committee and its members knew or should have known that the financial statements failed to report the estimated loss or range of loss, causing revenue to be overstated, expenses to be understated, and net income and earnings per share to be overstated;

(c)     As a result of reviewing trends relating to non-performing assets and charge-offs, the Audit Committee was aware that that level and adequacy of the allowance for loan and lease losses was inappropriate; and

(d)     As a result of knowing that the financial reports issued by First Horizon were

false and misleading due to inflated financial results, the Audit Committee was at least grossly

negligent in reporting First Horizon's true risks and for continuing to invest employee retirement

funds in the ESOP.

97.     First Horizon's current and past officers and directors are protected against personal

liability for their acts of gross mismanagement and breach of fiduciary duty alleged in this

Complaint by directors' and officers' liability insurance which they caused the Company to purchase

for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of First Horizon.

However, due to the language of certain directors' and officers' liability insurance policies, the

directors' and officers' liability insurance policies covering the defendants in this case contain

provisions which eliminate coverage for any action brought directly by First Horizon against these

defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these

directors were to sue themselves or certain of the officers of First Horizon, there would be no

directors' and officers' insurance protection and thus, this is a further reason why they will not bring

such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such

insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

### COUNT I

#### Against All Defendants
#### for Intentional Breach of Fiduciary Duty

98.     Plaintiff incorporates ¶¶1-97.

99.     Each of the defendants was a director and/or officer of First Horizon and as such

owed a fiduciary duty to First Horizon – the highest duty known to the law. Each of the defendants

agreed to and did participate in and/or aided and abetted another in a deliberate course of action

designed to allow First Horizon to engage in unlawful, improper and risky banking practices for

which there were no effective controls. Further, defendants concealed these harmful banking practices and lack of controls from shareholders and regulators. This misconduct caused defendants to breach their fiduciary duties owed to First Horizon and its shareholders.

100.    Defendants breached their fiduciary duties of candor, good faith and loyalty owed to First Horizon and its shareholders, by, among other things, failing to disclose material information, actively concealing, and/or making material misrepresentations to shareholders regarding defendants' improper banking practices and failure to control for known risks.

101.    As officers and/or directors of First Horizon, defendants participated in the wrongful acts of alleged herein. They have thus exposed First Horizon to liability associated with, *inter alia*, extensive litigation, and false reporting of financial information to the SEC and federal banking agencies. These events all threaten to further cost the Company millions of dollars in fines, penalties and increased professional fees.

102.    As corporate fiduciaries, defendants owed to First Horizon and its shareholders a duty of candor and full and accurate disclosure. As a result of the conduct complained of herein, defendants made, or aided and abetted in the making of, numerous misrepresentations to and/or concealed material facts from First Horizon's shareholders despite their duties to, *inter alia*, disclose the true facts regarding First Horizon. Defendants failed to fulfill their duty of candor in making full and accurate disclosures regarding the matters asserted herein. Thus defendants have violated their duty of candor.

103.    At all relevant times, defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company had undertaken unlawful activities and an unacceptable level of risk associated with its lending practices; and (ii)

maintain defendants' directorial and executive positions at First Horizon and the profits, power and prestige which defendants enjoyed as a result of these positions.

104.    Defendants' misconduct was not due to an honest error of judgment, but rather due to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

105.    By reason of the foregoing acts, practices and course of conduct, defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward First Horizon and its shareholders, harming First Horizon.

106.    By reason of the foregoing, First Horizon and its shareholders have been damaged.

## COUNT II

### Against All Defendants for Aiding and Abetting

107.    Plaintiff incorporates ¶¶1-97.

108.    As First Horizon officers and/or directors, each of the defendants named in the Complaint has acted in breach of their fiduciary duties to First Horizon and its shareholders and/or aided and abetted such breaches by acting unlawfully and/or facilitating the efforts of other defendants in this action to undertake banking practices harmful to First Horizon in the absence of meaningful controls.

109.    Defendants have violated fiduciary duties of candor, good faith and loyalty owed to First Horizon and its shareholders, have engaged in unlawful self-dealing, and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of First Horizon and its shareholders.

110.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing,

substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

111.    By reason of the foregoing, each of the defendants has aided and abetted the remaining defendants' violations of their own fiduciary duties, and First Horizon and its shareholders have been damaged as a result thereof.

112.    By reason of the foregoing, First Horizon and its shareholders have been damaged.

## COUNT III

### Against All Defendants for Abuse of Control

113.    Plaintiff incorporates ¶¶1-97.

114.    Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, First Horizon, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at First Horizon.  As a part of this scheme, defendants actively made and/or participated in the making of and/or aided and abetted the making of, misrepresentations regarding First Horizon.

115.    Defendants' conduct constituted an abuse of their ability to control and influence First Horizon.

116.    By reason of the foregoing, First Horizon and its shareholders have been damaged.

## COUNT IV

### Against All Defendants for Gross Mismanagement

117.    Plaintiff incorporates ¶¶1-97.

118.    Defendants had a duty to First Horizon and its shareholders to prudently supervise, manage and control the operations, business, and internal financial accounting and disclosure controls of First Horizon reasonably and in good faith.

119. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to managing the businesses of First Horizon in a manner consistent with the fiduciary duties imposed upon them by law. The First Horizon officers and directors identified as defendants herein grossly mismanaged the Company by: (i) violating lending laws; (ii) failing to control for known risks; and (iii) falsifying financial reports for the purpose of concealing their misconduct. By committing the misconduct alleged herein, defendants breached their duties of candor, good faith, and loyalty in the management and administration of First Horizon's affairs and in the use and preservation of First Horizon's assets.

120. During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused the Company to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to First Horizon, thus breaching their duties to the Company.

121. By reason of the foregoing, First Horizon and its shareholders have been damaged.

## COUNT V

### Against All Defendants for Unjust Enrichment

122. Plaintiff incorporates ¶¶1-97.

123. As a result of the conduct described above, defendants will be and have been unjustly enriched at the expense of First Horizon, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

124. Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

125. By reason of the foregoing, First Horizon and its shareholders have been damaged.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all defendants and in favor of First Horizon for the amount of damages

sustained by the Company as a result of defendants' breaches of fiduciary duty and violations of law;

B.      Extraordinary equitable and/or injunctive relief as necessary or permitted by law,

equity and statutory provisions sued hereunder, including disgorgement, attachment, impoundment

and imposition of a constructive trust on the unjust benefits received by defendants as a result of

their misconduct, so as to ensure that plaintiff on behalf of First Horizon has an effective remedy;

C.      Awarding to plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, experts' fees, costs and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June  2, 2010                      GLASSMAN, EDWARDS, WADE
                                          & WYATT, P.C.
                                          B.J. WADE, #5182


                                          ___s/B. J. Wade___
                                          B.J. WADE, #5182

                                          26 N. Second Street Building
                                          Memphis, TN  38103
                                          Telephone:  901/527-4673
                                          901/521-0940 (fax)

                                          BARRETT, JOHNSTON & PARSLEY
                                          GEORGE E. BARRETT, #2672
                                          DOUGLAS S. JOHNSTON, JR., #5782
                                          TIMOTHY L. MILES, #21605
                                          217 Second Avenue, North
                                          Nashville, TN  37201-1601
                                          Telephone:  615/244-2202
                                          615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   &DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: 610/225-2677
610/225-2678 (fax)

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
858/794-1450 (fax)

Attorneys for Plaintiff

**FIRST HORIZON NATIONAL
CORPORATION VERIFICATION**

I, Cranston Reid, hereby verify that I am familiar with the allegations in the

Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true

and correct to the best of my knowledge, information and belief.

DATE: _5/17_____        _Cranston Reid_____
                        **CRANSTON REID**